UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

```
PEPPER PATCH, INC.,              )
                                 )
     Plaintiff,                  )
                                 )  No. 3:05-0328
v.                               )  JUDGE ECHOLS
                                 )
BELL BUCKLE COUNTRY STORE, INC., )
                                 )
     Defendant.                  )
```

## MEMORANDUM

Pending before the Court is Plaintiff's Motion for Summary Judgment Dismissing Counterclaim (Docket Entry No. 19), to which the Defendant responded in opposition, and Plaintiff filed a reply.

## I. FACTS

Dot Smith is the founder, sole stockholder, and president of Plaintiff Pepper Patch, Inc. She formed the company in 1976 and incorporated it on January 4, 1977. Pepper Patch manufactures and sells about 75 gourmet products, including cakes, candies, dessert sauces, fruit butters, marmalades, and condiments. The products are marketed nationwide in stores that feature or sell only gourmet foods. The products are not available in ordinary grocery stores or supermarkets. Because consumers of Pepper Patch products shop in retail grocery stores, they are among the customers to whom Defendant Bell Buckle Country Store markets its products.

One of Pepper Patch's products is Jezebel's Sauce®. Pepper Patch received its Jezebel's Sauce® trademark, Reg. No. 1,380,667, from the United States Patent and Trademark Office ("PTO") effective January 28, 1986. The trademark secured to Pepper Patch

1

the exclusive use of the name "Jezebel's Sauce" in international class 30 for sauces. The name was the actual and only name of the sauce from the time it was first marketed by Pepper Patch to the present day. Smith attests that the statements she made to the PTO to obtain the trademark were completely truthful. (Docket Entry No. 22, Smith Aff. ¶ 4 & Ex. C.) The PTO issued notification on April 13, 1992, that Pepper Patch met the statutory requirements for incontestability of the trademark. (Smith Aff. Ex. D.)

For years southerners have prepared a home-made hot sauce called "jezebel sauce." The product is most often made by combining apple jelly, pineapple or apricot preserves, horseradish, and mustard. While there are many recipes available for jezebel sauce, the product is not commonly marketed in grocery stores under a well-known generic product name, such as "mayonnaise," "bread," "crackers," "mustard," or "ketchup."

Jezebel's Sauce® is made of fresh ingredients from a recipe Smith developed. The label lists the ingredients as sugar, pineapple, vinegar, fresh horseradish, and a rare and unique mustard. The product contains no preservatives, is pressure-sealed in a hex jar with an arch-topped label, and does not require refrigeration. (Id. at ¶¶ 4-5.)

A biblical figure, Queen Jezebel, inspired the name for Pepper Patch's sauce. (Id. at ¶ 3, 7.) Smith claims the possessive use of the historical name, Jezebel's Sauce®, results in a fanciful trademark. A small card attached to each jar reads:

> In the mid-South a "Jezebel" is an accepted descriptive term for a woman who is hot blooded and saucy. We suspect that these characteristics are the basis for the name of this concoction that is popular in the South.
> Pure pineapple, fresh grated horseradish and a blend of special spices give our sauce its sensuous taste.
> For a delicious hors d'oeuvre, serve Jezebel's Sauce as a canape with cream cheese. It is excellent as a condiment for meats; especially chicken, ham and roast beef. Try it as an unusual dip for shrimp or egg rolls.

(Docket Entry No. 27-5, Simmons Aff., Ex. E.)

Each party conducted Internet searches for usages and variations of the term, "jezebel" and "jezebel sauce," which resulted in thousands of "hits." Smith attests: "My limited computer search for a 'jezebel sauce' produced only one product with that name utilizing the possessive (Pepper Patch's), and out of a total of 34,800 other 'hits,' none other than Pepper Patch's (of the first hundred actually examined) are noted with an apostrophe." (Smith Aff. ¶ 8; Docket Entry No. 29, Defendant's Memorandum at 1-2.)[1]

Rodney Simmons is Chairman of Defendant Bell Buckle Country Store, Inc., a Tennessee corporation chartered in 1995. The company began as the food manufacturing arm of the Simmons family's

---

[1] Smith's affidavit lacks foundation to the extent it purports to state that 34,800 other "hits" did not show use of the name "jezebel" with an apostrophe because Smith admits she did not look at any of the "hits" beyond the first 100. (Smith Aff. ¶ 8.) Defendant's report in its legal Memorandum and in its "Responses to Statement of Material Facts" of its Internet search showing other uses of "jezebel's sauce" is not evidence for purposes of summary judgment because no supporting affidavit or other documentation was presented to substantiate the search. The Court considers the Internet searches only to establish context for this dispute. The information does not affect the Court's legal analysis.

3

retail store in Bell Buckle, Tennessee. The company originally produced and marketed Pepper Jelly for sale in the Bell Buckle store, but soon added more products for market through the wholesale system to shops in Tennessee and across the southeast. The company now markets five distinct brands in all fifty states and nineteen foreign countries. The brands are Captain Rodney's, Rose & Ivy, Simplify Gourmet, Bell Buckle Country Store, and Bainbridge Festive Foods. Through these brands, Bell Buckle markets over 150 products, which are found on the shelves of major grocery stores. (Docket Entry No. 27, Simmons Aff. ¶¶ 1, 3.)

Beginning in 1994, Bell Buckle packaged its Captain Rodney's Pepper Jelly in a hex jar. (Docket Entry No. 27-1, Ex. A.) Rose & Ivy brands were created after 1994 and have always been packaged in hex jars. Bell Buckle has used arch-topped labels for dressings and dessert toppings since 1996 and for jams and jellies since 1997. (Simmons Aff. ¶ 4 & Ex. B.)

The first wholesale showing of Bell Buckle's products was at the Atlanta Gift Mart in 1996. The products were presented in hex jars using the Captain Rodney's and Rose & Ivy brand names. Bell Buckle displayed its Pepper Jelly in a hex jar. Pepper Patch also attended the Atlanta Gift Mart in 1996 and displayed its Pepper Jelly in a round jar. (Docket Entry No. 27-3, Ex. C.) In 1998, Bell Buckle won the Best of Atlanta Award for its Captain Rodney's Pepper Jelly. Shortly thereafter, Pepper Patch changed its packaging to a hex jar with an arch-topped label. (Docket Entry No. 27-4, Ex. D.)

4

According to Pepper Patch, its Director of Sales, Angie Moore, attended a trade show in Atlanta in July 2004. Rodney Simmons visited Pepper Patch's booth. He viewed and sampled "Jezebel's Sauce®." Simmons wondered "what she puts in it," or words to that effect. The "she" referred to Dot Smith, President of Pepper Patch.[2] (Docket Entry No. 21, Moore Aff.)

Bell Buckle began advertising a "Jezebel Sauce" under the Rose & Ivy name in a 2005 Nashville Wraps LLC catalog.[3] (Smith Aff. ¶ 11 & Ex. F.) After learning of the advertisement, Pepper Patch, through its attorney, promptly demanded that Nashville Wraps cease and desist what Pepper Patch considered to be an infringing use of the Jezebel's Sauce® trade name, and Nashville Wraps complied. When Pepper Patch demanded that Bell Buckle cease and desist, it failed to comply, so this action was initiated. (Id. at ¶ 12.) Smith believes Bell Buckle adopted the "Jezebel Sauce" name to imitate Pepper Patch's product and to lead consumers to believe

---

[2]In its responses to Plaintiff's Statement of Material Facts, Bell Buckle denies this interaction between Moore and Simmons occurred and states that Bell Buckle's product had been developed prior to this alleged incident. (Docket Entry No. 28 at ¶¶ 24, 29.) However, such facts are not included in Simmons' affidavit, so for purposes of summary judgment, the Court must accept the facts stated by Plaintiff as true. While helpful to understand the context of the dispute, whether Simmons tasted Jezebel's Sauce® at the trade show ultimately is not material to the Court's legal analysis.

[3]Bell Buckle admits that Nashville Wraps markets and sells to many of the same gift shops, gourmet shops and other retail venues in which Pepper Patch markets and sells. (Docket Entry No. 28, Response to Statement of Material Facts ¶ 13.) Again, this fact is not evidence because it was not presented by affidavit, but the parties do not appear to dispute that they are competitors.

5

that Bell Buckle's product was actually a Pepper Patch product. (Id. at ¶ 13.)

Bell Buckle represents that it has not delivered any of its "Jezebel Sauce" to any supplier or customer and has removed it from any marketing materials or plans until this matter is resolved. Based on the letter from Pepper Patch's attorney, Nashville Wraps cancelled its orders for the item and no product was delivered.[4]

Pepper Patch sued Bell Buckle for trademark infringement and false designation of origin of goods under 15 U.S.C. § 1125. Bell Buckle counterclaimed for tortious interference with business contract (Count I), trade dress infringement (Count II), and cancellation of trademark (Count III). Pepper Patch now moves for summary judgment on all three of Bell Buckle's claims.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.

---

[4] Again, this information appears in Bell Buckle's "Responses to Plaintiff's Statement of Material Facts" (Docket Entry No. 28 ¶ 27) and not in Simmons' affidavit, but the Court will accept it as true because Pepper Patch does not dispute it.

6

See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

**A. Tortious interference with a business relationship**

Under Tennessee law, the elements of the tort of intentional interference with a business relationship are: (1) an existing business relationship with a specific third party or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3)

7

the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701 (Tenn. 2002). Whether a party acts "improperly" or possesses an "improper motive" is dependent on the particular facts and circumstances of the case. Id. at 701 n.5. The plaintiff must demonstrate the defendant's predominant purpose was to injure the plaintiff. Id.

The claim of tortious interference fails because Bell Buckle has not presented any evidence that Pepper Patch acted with improper motive or that Pepper Patch's predominant purpose in directing its attorney to send a cease and desist letter to Nashville Wraps was to injure Bell Buckle. Bell Buckle *argues* that Pepper Patch harbored an improper motive to injure, but Simmons' affidavit does not include any allegations concerning Pepper Patch's improper motive, nor does Bell Buckle present any other evidence of Pepper Patch's improper motive or means that would create a genuine issue of material fact for trial. The only evidence before the Court on the subject of motive is Smith's affidavit, which establishes that Pepper Patch acted in good faith to protect its registered trademark in Jezebel's Sauce®. Thus, Pepper Patch is entitled to summary judgment on Count I of the Counterclaim.

8

**B. Trade dress infringement**

Title 15 U.S.C. § 1125(a) protects against the infringement of the unregistered trade dress of a product. Gray v. Meijer, Inc., 295 F.3d 641, 645 (6th Cir. 2002). Trade dress "embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sale." Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc., 280 F.3d 619, 629 (6th Cir. 2002). See also Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP, 423 F.3d 539, 547 (6th Cir. 2005) (noting Supreme Court has defined trade dress as "'design or packaging of a product'" which has acquired a 'secondary meaning' sufficient 'to identify the product with its manufacturer or source[,]'" quoting TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 28 (2001)).

To prevail on a claim of trade dress infringement, a party must show: (1) that its trade dress is distinctive in the marketplace; (2) that the trade dress is primarily nonfunctional; and (3) the trade dress of the competing product is confusingly similar. Id. To prove that the purportedly infringing mark is likely to cause confusion in consumer's minds, the Court must consider eight factors, commonly known as the Frisch factors: (1) strength of the mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) competitor's intent in selecting the mark; and (8) likelihood of

9

expansion of the product lines.  See Gray, 295 F.3d at 645-646. Because Pepper Patch moves for summary judgment on the ground that it adopted its trade dress first and Bell Buckle cannot satisfy the necessary elements of trade dress infringement, Bell Buckle must come forward with sufficient evidence to generate a genuine issue of material fact for trial on each element of its trade dress infringement claim.

As to the first element, Bell Buckle has produced some proof that its brands, including Rose & Ivy, are distinctive in the national and international marketplace, although Bell Buckle produces very little proof as to the distinctiveness and strength of its particular Rose & Ivy "Jezebel Sauce" mark, which was first adopted in 2005.

As to the second element, concerning function of trade dress, Pepper Patch produced proof that it began using an arch-topped label with the Jezebel's Sauce® mark many years before Bell Buckle came into existence as a company.  In response, Bell Buckle states that an arch-topped label is an industry standard used by many food producers because it maximizes front label space while still allowing the product to be viewed.  (Docket Entry No. 28 at ¶ 23 Response).  Thus, Bell Buckle essentially contends the arch-topped labels used by both parties are functional, even though they are substantially different in length.  See Antioch Co. v. Western Trimming Corp., 347 F.3d 150, 155 (6th Cir. 2003) (observing a product feature is functional if it is essential to the use or purpose of the article).  To prevail on trade dress infringement,

10

however, the complaining party must show that the allegedly infringing feature is <u>not</u> functional, that it is part of the trade dress identifying the source of the product, and that it is likely to cause confusion among customers. Antioch Co., 347 F.3d at 154. Bell Buckle has not carried that burden here.

As to the third element concerning confusing similarity, Bell Buckle produced evidence that it began using hex jars before Pepper Patch decided to switch from round jars to hex jars. Other than suggesting Pepper Patch copied Bell Buckle's use of the hex jar, Bell Buckle does not explain in any detail how its trade dress and the trade dress used by Pepper Patch are confusingly similar. See id. ("where the claimed trade dress is actually a *type* of product, one supplier may not monopolize the configuration to the exclusion of others.") In fact, in response to Pepper Patch's Statement of Material Fact ¶ 22, Bell Buckle asserts:

> The labels differ in background colors, layout styles, fonts and text colors, as well as in featured artwork. Pale buttercream is the background color of Bell Buckle Country Store's dress label--Pepper Patch's is an ivory background. Buttercream is a light yellow tint while ivory is a very pale brown tint. The FDA dictates placement of much information on a label, so there are similarities that cannot be avoided. <u>If the products are compared side-by-side, they appear very different.</u>

(Docket Entry No. 28 at ¶ 22 Response (emphasis added).) In response to Statement of Material Fact ¶ 29, Bell Buckle states: "When observing the products side-by-side, the differences are apparent. There is nothing in the packaging or dress label on the Bell Buckle Country Store product that would lead customers to

11

conclude that the *Rose & Ivy* brand Jezebel Sauce is a Pepper Patch product." (Id.)

Thus, Bell Buckle's responses establish the opposite of confusing similarity--Bell Buckle concedes that, even though both parties package their products in hex jars with arch-topped labels, the labels so contrast in background and text color, style, and font that when compared "they appear very different." The concept underlying likelihood of confusion is that the public must be led to believe that Bell Buckle sponsored or otherwise approved the use of Pepper Patch's trade dress, which Bell Buckle alleges infringes on its own Rose & Ivy trade dress. See Gray, 295 F.3d at 646. Thus, Bell Buckle's admission that the two products are not similar undercuts Bell Buckle's attempt to prove the third element of its trade dress infringement claim. Summary judgment has been affirmed where "the differences in the two packages and the general impression each creates are not similar." Id. at 648.

The products are clearly related in that both involve jezebel sauce and use similar trade names. In all other respects, however, Bell Buckle has not carried its burden of proof on the Frisch factors. Bell Buckle has produced no evidence of actual confusion by customers, of the marketing channels used by the competing products (other than that Bell Buckle intended to use Nashville Wraps to market its Jezebel Sauce), of the likely degree of purchaser care, of Pepper Patch's intent in selecting its trade dress, or of the likelihood of expansion of the product lines. Without proof on these issues, Bell Buckle has not created a

12

genuine issue of material fact for trial on the pertinent elements of the trade dress infringement claim. Therefore, Pepper Patch is entitled to summary judgment.

**C. Cancellation of Pepper Patch's trademark**

Pepper Patch's registered trademark is incontestable. Title 15 U.S.C. § 1119 gives this Court jurisdiction to cancel a trademark registration, but the statute does not specify any particular grounds on which such a cancellation could be based. The Fourth Circuit held in Shakespeare Co. v. Silstar Corp., 9 F.3d 1091, 1097 (4th Cir. 1993), that a court is restricted to the grounds for administrative revocation of a trademark found in 15 U.S.C. § 1064. That statute was later amended in 1998, after the opinion in Shakespeare Co. was issued, to add "functionality" as a ground for cancellation. But the statute has not included as a ground for cancellation, before or after Shakespeare Co., the generic nature of the mark at the time it was registered.[5] Section 1064 does provide that a registered trademark may be cancelled "[a]t any time if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered . . . or its registration was obtained fraudulently[.]" See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985); Nartron Corp. v. STMicroelectronics, Inc., 305 F.3d 387, 404 n.7 (6th Cir. 2002). Bell Buckle contends Pepper Patch's

---

[5]A generic term denotes the thing itself and cannot be appropriated from the public domain by one party. Blinded Veterans Ass'n v. Blinded Am. Veterans Foundation, 872 F.2d 1035, 1039 (D.C. Cir. 1989).

13

registered trademark should be cancelled because "Jezebel's Sauce" was a generic term not entitled to trademark protection at the time registration was obtained. Alternatively, Bell Buckle asserts Pepper Patch obtained the mark by defrauding the PTO.

The Court concludes under Shakespeare Co. that it lacks statutory authority to cancel Pepper Patch's incontestible trademark on the ground that the mark was generic when registration was sought. This is consistent with the principle that when a mark registered on the federal principal registry is "merely descriptive" and has become incontestable pursuant to 15 U.S.C. § 1065, the mark is presumed to have acquired a secondary meaning. Nartron Corp., 305 F.3d at 404 n. 7; Kern's Kitchen, Inc. v. Bon Appetit, 850 F.2d 692, 1988 WL 69137 at *1 (6th Cir. 1988) (unpublished). Registration places the burden on the defendant to overcome the presumption and show that the primary use of the term is generic. Kern's Kitchen, Inc., 1988 WL 69137 at *1-2. But here, Bell Buckle has not produced any *evidence* that at the time Pepper Patch sought trademark registration the primary significance of "Jezebel's Sauce" in the mind of the public was the product and not the producer, Pepper Patch. Nor has Bell Buckle produced any evidence that the registered trademark Jezebel's Sauce® has become the generic name for the product. Id. at *2 (noting anecdotal evidence, in light of failure to introduce scientific survey evidence to support assertion that public view of term was generic, was insufficient in summary judgment context); Nartron Corp., 305 F.3d at 406 (noting test of generic or descriptive name for

14

ordinary consumer good is the term's meaning to consumers, not professionals in the trade). Bell Buckle has produced only argument that the term was or has become generic. See <u>Kern's Kitchen, Inc.</u>, 1988 WL 69137 ("'Consumer surveys have become almost de rigeur in litigation over genericness.'"; "'a survey is preferable to attorneys, litigants and judges merely arguing and extrapolating from their own personal perceptions[,]'" quoting J. McCarthy, Trademarks and Unfair Competition, § 12.2, 529, 533 (2d. ed. 1984)).

Similarly, Bell Buckle has not produced any evidence of fraud to controvert Smith's affidavit that all information she provided to the PTO was truthful. Pepper Patch is entitled to summary judgment on this claim as well.

## **IV. CONCLUSION**

Even taking the facts in the light most favorable to Bell Buckle, the Court concludes that Bell Buckle has not generated genuine issues of material fact for trial on its three counterclaims for tortious interference, trade dress infringement, and cancellation of trademark. Accordingly, Plaintiff's Motion for Summary Judgment Dismissing Counterclaim (Docket Entry No. 19) will be GRANTED.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE